**Justin Lee MAY, Petitioner–Appellant,**

**v.**

**James A. COLLINS, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.**

No. 91–6273.

United States Court of Appeals, Fifth Circuit.

Feb. 26, 1992.

---

state court was adequate for purposes of the § 2254(d) presumption of correctness. We also conclude that the district court properly denied the writ in reliance on the state court's findings. We therefore affirm the order of the district court and vacate the stay of execution we previously entered.

Barbara Lowe, Houston, Tex., David T. Shelledy, Willard K. Tom, Francis M. Gregory, Jr., Sutherland, Asbill & Brennan, Washington, D.C., for petitioner-appellant.

Dana Parker, Asst. Atty. Gen., Dan Morales, Atty. Gen., Bob Walt, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

On Application for a Certificate of Probable Cause

Before KING, JOLLY and SMITH, Circuit Judges.

KING, Circuit Judge:

In a line of cases dating back to 1983, this court has considered the circumstances under which state trial court findings of fact made solely in reliance on written affidavits are entitled to a presumption of correctness in federal habeas proceedings.[1] In this, Justin Lee May's third federal habeas corpus petition, the district court concluded that factfindings made by a state trial court were entitled to deference pursuant to 28 U.S.C. § 2254(d) despite the lack of a live evidentiary hearing to resolve disputed facts. On the basis of the state court's findings, the district court determined that May was not entitled to relief. May seeks a certificate of probable cause to appeal, contending that, because the "trial by affidavit" he received in state court was inadequate to afford him a full and fair hearing, the district court erred in presuming the correctness of the findings and should have held a hearing. Because resolution of this question under the particular circumstances of this case is debatable among jurists of reason, we grant the certificate of probable cause to appeal. We conclude, however, that May's hearing in

## I. BACKGROUND AND PROCEDURAL HISTORY

A full review of the facts may be found in the Texas Court of Criminal Appeals' opinion affirming May's conviction on direct appeal, *May v. State*, 738 S.W.2d 261 (Tex.Crim.App.), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 158 (1987), and in our opinion denying May's first petition for habeas corpus, *May v. Collins*, 904 F.2d 228 (5th Cir.1990) (per curiam), *cert. denied*, —— U.S. ——, 111 S.Ct. 770, 112 L.Ed.2d 789 (1991). The facts are presented here only to the extent necessary for an understanding of the issues raised in this appeal.

### A. *The Murder of Jeanetta Murdaugh*

In 1978, Frank and Jeanetta Murdaugh were murdered while working in their Western Auto store in Freeport, Texas, in Brazoria County. The police had few leads and the murders went unsolved for over five years. The break in the case came when an ex-convict named Oren Howard told police of conversations he had had in prison with fellow inmates May and Richard Miles in which May and Miles implicated themselves in the murders. Indictments against May and Miles were handed down in 1984, and May was tried solely for the murder of Jeanetta Murdaugh. He was convicted and sentenced to death. Miles pled guilty to nonaggravated, noncapital murder in exchange for his testimony against May.

The State's case against May was heavily dependent on the testimony of Howard and Miles. Howard testified about two conver-

---

1. *See Carter v. Collins*, 918 F.2d 1198 (5th Cir. 1990); *Buxton v. Lynaugh*, 879 F.2d 140 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990); *Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir.1987); *Evans v. McCotter*, 805 F.2d 1210 (5th Cir.1986); *Smith v. Estelle*, 711 F.2d 677 (5th Cir.1983), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1685, 80 L.Ed.2d 159 (1984).

sations he had had in which May was involved. In the first conversation, May learned that Howard was from Freeport and asked whether Howard was familiar with the Western Auto store in that city. According to Howard, the two disagreed about the location of the store, and May said "I know because me and my fall buddy was going to hit that Western Auto store and that old man and woman died." The second conversation took place several months later, and involved Howard, May and Miles. Howard testified that, as they discussed past and future robberies, Miles mentioned as a "good score" for a future robbery a store in a town near Freeport that was operated by an elderly couple. Miles then suggested that, if May participated, there would be no problems because May would shoot. According to Howard, May then reminded Miles, "you know what we got in Freeport? We got a death sentence waiting on us in Angleton [county seat of Brazoria County]." Howard testified that May then told the story of the robbery and murders:

> Told me that they pulled up to the store. He walked in first. Went over to some shelves where they put stuff on shelves. There was an elderly woman over there close to the shelves and an old man behind the counter. And that Miles walked in and was talking to the old man about a shotgun; wanted to look at a shotgun or something. He said the old man handed him a shotgun. Then he wanted some shells. He told him he would take the shotgun and wanted some shells. Said the old man handed him some and he started loading the shotgun in the store and said the old man snapped and grabbed the shotgun and told him he can't do it, and was wrestling over the shotgun and it went off and hit the ceiling. The old woman hollered and started running that way and Justin said he blowed her away from behind. And they was still wrestling over the shotgun; this old man and Miles. And Miles said he turned around and looked at Justin and Justin spun around and shot the old man off of him.

Miles testified that on the day before the murders, he and May drove from Houston to Freeport. Miles carried a .32 caliber pistol in the glove compartment. Because Miles was on parole and was not supposed to leave Houston without permission, they registered at a Freeport hotel under an assumed name. The next day, May suggested robbing the Western Auto store. His plan was for Miles to enter the store first, pretend to be interested in purchasing a shotgun, and load the shotgun. May would enter the store armed with Miles's pistol. Late in the afternoon of June 27, 1978, Miles entered the Western Auto store and began to load a shotgun. By this time, May had entered the store with Miles's pistol concealed under his shirttail. Frank Murdaugh told Miles that he could not load the gun in the store, and, when he reached for the gun, May shot him. Miles, startled by the shot, fired the shotgun into the ceiling and ran to the front door. Miles heard several shots and saw May shoot Jeanetta Murdaugh. Miles then picked up his car, drove around the block, and drove to the end of the alley behind the store. May ran down the alley carrying an armload of guns, dropping one along the way. May placed the rest of the guns in the car and returned Miles's .32 pistol.

## B. Proceedings for Post–Conviction Relief

### 1. The First Two Rounds of Habeas

After May's conviction was affirmed on direct appeal and an execution date was set, he sought a writ of habeas corpus in state court. That court denied relief, as did the Texas Court of Criminal Appeals. *Ex Parte May*, Writ No. 17,992–01 (Tex. Crim.App. June 3, 1988). He subsequently sought habeas relief in federal court, *inter alia* on grounds that application of the Texas capital sentencing scheme in his case was unconstitutional under *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). We affirmed the district court's denial of his petition, finding that his tactical decision not to introduce certain mitigating evidence removed his claim from the ambit of *Penry*. *May v. Collins*, 904 F.2d 228 (5th Cir.1990) (per curiam), *cert. denied,* —— U.S. ——, 111

S.Ct. 770, 112 L.Ed.2d 789 (1991). May's execution was rescheduled for April 30, 1991. He filed a second state habeas petition in the trial court on April 18, 1991, but the court again denied relief. The Court of Criminal Appeals stayed the execution in order to consider the appeal, but ultimately denied relief and vacated the stay. *Ex parte May*, No. 17,992–02 (Tex.Crim.App. Oct. 15, 1991). May's execution was rescheduled for November 26, 1991. On November 15, May initiated his second federal habeas petition, this time contending that the Texas capital sentencing scheme violated his Sixth Amendment right to effective assistance of counsel by preventing counsel from introducing mitigating evidence. The district court denied relief and we refused to grant either a certificate of probable cause to appeal or a stay of execution. *May v. Collins*, 948 F.2d 162 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 808 (1992).

While his certificate of probable cause to appeal the second habeas petition was pending, May filed a supplemental emergency motion for "appropriate relief" or, in the alternative, an original petition for a writ of habeas corpus to allow the consideration of newly discovered evidence showing that May was innocent. Attached to these papers were affidavits procured from Richard Miles and Oren Howard on November 22, 1991, in which the two men stated that their trial testimony was false. They also stated that the prosecutors had assisted them in fabricating their testimony, and that the testimony was used against May with knowledge that it was false. May argued that the affidavits showed that a due process violation would result in the execution of a person who was actually innocent of the crime. We declined to consider this motion, however, pointing out that "[t]he alleged constitutional violation which appears to underlie the late-filed motion is not the subject of any petition for habeas relief presently pending in the state courts or in the federal district court." *May v. Collins*, 948 F.2d at 168. We similarly declined to exercise our original jurisdiction under Fed.R.App.P. 22(a) to consider habeas petitions filed initially in the

court of appeals or to refer such petitions to the district court. For the reasons set forth in that opinion, *see id.* at 168–69, we dismissed without prejudice the supplemental emergency motion in order to enable May to file in the state court.

### 2. The Third Round of Habeas

Our opinion denying relief was issued on Saturday, November 23, 1991. May filed his third state court petition, as expected, later that day in the District Court for the 23rd Judicial District of Brazoria County, Texas. In it, he alleged that the facts which formed the basis for the petition did not become known to him until Friday, November 22, when Miles and Howard recanted their trial testimony in sworn affidavits. May appended these affidavits, as well as a January 1988 affidavit from Richard Miles. The earlier affidavit, given in anticipation of May's first round of habeas petitions while Miles was still in prison for the Murdaugh murder, contained suggestions that prosecutors had threatened to alter Miles's plea bargain if Miles failed to implicate May in his trial testimony. Miles stated that at about the time of his plea bargain, he had given a pretrial statement describing the events of the crime. He then stated that he "believed that the plea bargain required that my testimony at trial be consistent with my pretrial statement and that if my testimony surprised the prosecutors because it did not implicate Justin May or otherwise deviated substantially from my pretrial statement, the state would not have to permit me to plead guilty to the lesser offense and would instead try me for capital murder." Miles went on to describe conversations he had prior to trial with Assistant District Attorney John Davis and Freeport detective Charles Wagner in which Davis and Wagner coached his testimony and supplied him with details of the crime he could not recall. According to Miles, "[t]hey made it clear that I should testify to the way they said [the crime] happened." Miles also contended that, during a break in cross-examination, Davis berated him for straying from the script and threatened "problems"

which Miles understood to mean revocation of the plea bargain. This affidavit was couched in extremely guarded language, however, with Miles saying only that the meetings "altered" his memory of events and "influenced" his testimony. He did not indicate in any way that his testimony concerning May's involvement in the crime was not true.

In the November 1991 affidavits, both Miles and Howard categorically stated that their testimony was false. Miles, who by that time was out of prison,[2] stated that, although his testimony concerning his presence at the scene of the crime was correct, his testimony concerning May's involvement was fabricated:

> My testimony concerning Justin Lee May's involvement was not true. While I was present, and was an eyewitness to the offense, Justin Lee May was not present, nor did he participate in the offense in any manner. All of my testimony concerning his involvement in this crime was untrue.

Miles further stated that his false testimony was largely supplied by police and the district attorney's office, and that he cooperated in their scheme because he feared that if he did not, the State would attempt to prosecute him for capital murder:

> As I have said previously, the district attorney's office and the police coached me a lot on my testimony . . . .
>
> Throughout the police's questioning of me on this offense, it was clear to me that they were trying to get me to say that Mr. May was involved and actually committed the murders. They said that a convict named Howard had told them that both myself and May had talked about this crime while we were both in prison, and that May had said he had done the crime with me. At one point Captain Wagner with the Freeport police showed me a statement which he said was given to him by May. It said that I had done the crimes. I went along with Wagner because of the statement, and Captain Wagner told me that I could be executed if I didn't cooperate, so I decid-

ed to cooperate with the police and tell them what they seemed to be after. This was to pin the actual shootings on Justin May.

Howard in his November 1991 affidavit similarly recanted his testimony at trial in which he told of his conversations with May and Miles:

> Practically everything I testified to at Mr. May's trial was a lie. About the only thing that was true was that I knew Richard Miles and that I had met Justin May once at the Ramsey unit. I testified the way I did because I was scared and I thought I would get reward money if Justin May was convicted.

Like Miles, Howard contended that he had concocted his testimony at the behest of police and prosecutors:

> The next I knew, police from Freeport were in the Clute office asking me questions and telling me about the crime. I didn't know anything about it, but over the next few months they filled in the details. I don't remember who said what anymore, but I do remember what was said. I told them that I had heard someone talking about a shotgun blasting the ceiling during a robbery. I had no idea that this had any connection to the Western Auto robbery/murder, but the police told me it did . . . .
>
> The police also told me that an eyewitness, a black man, had seen two men, one white and one dark, driving off in a white van from the Western Auto . . . .
>
> [Assistant District Attorney John Davis] showed me newspaper clippings about all the reward money available to the person who caused the arrest, indictment and conviction of the people who committed the Western Auto murders. He told me that if I testified, I would get all the money.
>
> When it got close to trial, I spent days with District Attorney Maple [sic] preparing for my testimony. Just like the police, he made sure I had whatever I wanted. Mapel told me not to talk to the defense attorney before trial. He spent

2. Miles was paroled in December 1990.

three or four days drilling me on cross examination questions. He told me that, if asked, I was to say that no promises were made to me, no deals of any kind. I was not to talk to Justin May's attorneys about the promised reward money at all. So I didn't. When May's lawyer asked me, I told him there were no promises or deals.

On the basis of these affidavits, May claimed that the prosecutors, by knowingly or recklessly eliciting false testimony, interfering with the cross-examination of Miles, and failing to disclose the circumstances under which Miles's testimony was obtained, violated his rights to due process, a fundamentally fair trial, and confrontation of witnesses under the Sixth, Eighth and Fourteenth Amendments. The due process violation of knowingly using perjured testimony was based on *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam); the due process violation of failing to disclose the circumstances under which Miles's testimony was obtained was based on *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Giglio;* and the Sixth Amendment claim was based on *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).[3]

In its answer, the State submitted, *inter alia*, the affidavits of Jim Mapel, Criminal District Attorney for Brazoria County; John Davis, an assistant district attorney at the time of May's trial and the prosecutor responsible for trying May; Charles Wagner, the Freeport police officer who, according to Miles and Howard, supplied them with details of the murders; Mark Wicker, a Clute, Texas police officer who, according to Howard, supplied him with additional details; and Michael Echevarria, May's trial attorney. The prosecutors and police officers categorically denied the allegations of misconduct. They admitted to having had conversations about the murders with Miles and Howard, but contended that they took the information as Miles and Howard told it, without supplying details. Mapel and Davis further stated that they never supplied Miles or Howard with details for their testimony, never coerced either into testifying falsely, and did not knowingly use perjured testimony. Echevarria stated that he had spoken with Miles prior to trial and that Miles had never complained of prosecutorial coercion. The State also supplied the pretrial statements given to the police by Howard and Miles before trial, in which May was identified as Jeanetta Murdaugh's killer; a 1985 newspaper article reporting that Howard denied receiving money for his testimony; a 1987 letter from Miles to Davis asking for assistance with a furlough, relating that May's counsel had inquired about the preparation of Miles's testimony, and stating that he thought Davis had "acted within the rules of the game"; and the record of an interview May had given while in the Texas Department of Corrections in which he admitted to his presence at the crime scene but denied that he had shot anyone.

The petition and affidavits were considered by Judge J. Ray Gayle III, the same judge who had presided over May's trial. On Monday, November 25, Judge Gayle, without holding a hearing, entered findings of fact and conclusions of law. Among the trial court's findings of fact were the following:

9. John Davis discussed the facts of the case with Miles, in detail, in preparation for trial. However, Davis did not provide information to Miles or inform Miles how to testify other than to testify truthfully.

16. Based upon the record before this court, and the affidavits of Jim Mapel, John Davis, Michael Echevarria, Charles Wagner and Mark Wicker, and the T.D.C. records wherein May admits to being present at the store when the Murdaughs were murdered, the court finds that the statements contained in the affidavit of Richard Miles dated November 22, 1991, are not credible and that they are unworthy of belief.

---

**3.** The affidavits do not appear to form the basis for an Eighth Amendment claim, and May has not pursued any such claim in either the state or federal courts.

17. The prosecution did not knowingly present false or misleading evidence through Miles' testimony.

20. Based upon the record before this court, and the affidavits of Jim Mapel, John Davis, Michael Echevarria, Charles Wagner and Mark Wicker, and the T.D.C. records wherein May admits to being present at the store when the Murdaughs were murdered, the court finds that the statements contained in Howard's affidavit of November 5, 1991, are not credible and that they are unworthy of belief.

23. The Court finds that the prosecution did not knowingly present false evidence or misleading evidence through Howard's testimony.

26. There is no evidence that the prosecution knew any evidence presented at the trial of this case was false or misleading.

On the basis of these findings, the court concluded that May could not establish that the prosecutors had violated his due process rights by knowingly presenting false testimony which was material to the case. The court also determined that the prosecution had not failed to disclose exculpatory evidence as required by *Brady*. The court did not address the Sixth Amendment claim, but the finding that Miles's affidavit was not true clearly eliminated the basis for that claim. In the "alternative only," the court concluded that the prosecution did not know, and did not have reason to know, that the evidence was false, because neither Miles nor Howard had previously come forward with their information. Later on November 25, the Texas Court of Criminal Appeals found the trial court's findings of fact and conclusions of law supported by the record, and accordingly denied relief. *Ex parte May*, No. 17,992–03 (Tex.Crim.App. Nov. 25, 1991).

May immediately filed a petition for a writ of habeas corpus and a motion for a stay of execution in federal court, raising the same constitutional claims that had been rejected in the state courts. Anticipating the State's response, he also argued that the district court should consider the petition despite the fact that the claim had not been raised in his previous habeas petitions. He contended that the petition fell within the exception to the abuse of the writ doctrine articulated in *McCleskey v. Zant*, —— U.S. ——, 111 S.Ct. 1454, 1471, 113 L.Ed.2d 517 (1991), for those constitutional claims which are supplemented with a colorable showing of factual innocence. Alternatively, May argued that he met the cause and prejudice standard which would, under *McCleskey*, enable a federal court to entertain a claim raised for the first time in a subsequent petition. The State responded by denying the allegations in the petition and arguing that the state court's factfindings were entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Citing our decisions in *Buxton v. Lynaugh*, 879 F.2d 140 (5th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990), *Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir.1987), and *Smith v. Estelle*, 711 F.2d 677 (5th Cir.1983), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1685, 80 L.Ed.2d 159 (1984), the State asserted that the state court's resolution of the factual issues on the basis of affidavits constituted a "hearing" within the meaning of § 2254(d) sufficient to trigger the presumption. In the alternative, the State pled abuse of the writ and asked the district court to dismiss under Rule 9(b) of the Rules Governing § 2254 Cases.[4]

The district court held that the facts found by the state court were entitled to the presumption of correctness. Moreover, none of the seven exceptions to § 2254(d) were applicable. Following our decision in *Buxton*, the court pointed out that the state factfinding procedures were adequate

---

**4.** The State made clear that its decision to assert abuse of the writ only in the alternative arose from a desire to avoid a stay of execution pending the Supreme Court's decision in *Sawyer v. Whitley*, No. 91–6382 (cert. granted Nov. 14, 1991 on the question of actual innocence of the

death penalty). This court ultimately granted a stay of execution and requested supplemental briefing. Nevertheless, because the State pled abuse of the writ in the district court, we consider it fully applicable to this proceeding. *See infra* Section III.

despite the lack of a live evidentiary hearing:

> The Fifth Circuit has determined that when (1) a state court enters written factfindings in which credibility questions are resolved and (2) the same state district judge hears both the trial on the merits and the state application for writ of habeas corpus, the state factfinding procedures are entitled to a presumption of correctness even without a state evidentiary hearing. *Buxton v. Lynaugh*, 879 F.2d 140, 144–46 (5th Cir.1989), *cert. denied*, [—— U.S. ——], 110 S.Ct. 3295 [111 L.Ed.2d 803] (1990).

The court declined to grant May an evidentiary hearing and, because it found the state court findings amply supported by the record, denied May's constitutional claims. The court denied a certificate of probable cause to appeal and denied the motion for a stay of execution. Shortly after the district court entered its order, May filed a reply brief challenging the application of the presumption of correctness to the state court findings. The district court issued an addendum to its earlier order again explaining that, where credibility determinations are made on a paper record by a state judge who had an opportunity to view the witnesses at the trial, the petitioner has received a hearing sufficient to invoke the presumption of correctness. May applied to this court for a certificate of probable cause to appeal and moved for a stay of execution. We granted the stay and the Supreme Court denied the State's application for an order vacating it. We then requested supplemental briefing to assist us in resolving the question whether the state court factfinding procedures afforded May a "full and fair hearing," and are now prepared to rule both on the application for a certificate of probable cause and the merits of the claim.

## II. CERTIFICATE OF PROBABLE CAUSE TO APPEAL

Because the district court denied a certificate of probable cause to appeal, Fed. R.App.P. 22(b) denies us jurisdiction to hear May's appeal unless May has made a " 'substantial showing of the denial of [a] federal right.' " *Barefoot v. Estelle*, 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983) (quoting *Stewart v. Beto*, 454 F.2d 268, 270 n. 2 (5th Cir.1971), *cert. denied*, 406 U.S. 925, 92 S.Ct. 1796, 32 L.Ed.2d 126 (1972)); *Jones v. Whitley*, 938 F.2d 536, 539 (5th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 8, 115 L.Ed.2d 1093 (1991). To succeed in this showing, May "must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Barefoot*, 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4 (citations omitted); *see Sawyer v. Whitley*, 945 F.2d 812, 815 (5th Cir.) (granting CPC to determine whether appellant could be actually innocent of his death sentence because case "presented a question which is debatable among jurists of reason"), *cert. granted*, —— U.S. ——, 112 S.Ct. 434, 116 L.Ed.2d 453 (1991).

■ We are convinced that the issue presented by May's most recent appeal is "debatable among jurists of reason" and therefore grant the certificate of probable cause. Although the Supreme Court's decision in *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), makes clear that the lack of a live evidentiary hearing in state court is not automatically fatal to the § 2254(d) presumption of correctness, this court has not previously addressed a state court's use of a "paper hearing" to resolve a factual dispute involving the credibility of recanting witness affidavits. Our decisions since *Sumner* have dealt primarily with "paper hearings" underlying ineffective assistance of counsel claims. *E.g., Buxton, supra.* Moreover, the parties have fully briefed the issue in response to our request for supplemental briefing. Under these circumstances, we believe a full review on the merits is warranted.

## III. SUCCESSIVE AND ABUSIVE CLAIMS

In his first federal habeas petition, May raised two of the constitutional claims he

presses here: (1) that prosecutors knowingly used Miles's "coached" testimony and (2) that prosecutors interfered with cross-examination through intimidation of Miles. In our opinion affirming the district court's denial of relief on, *inter alia*, these two claims, we stated that after review of the briefs, argument and record, "we are in substantial agreement with the [district] court's analysis on [these claims]." *May v. Collins*, 904 F.2d at 230. Under 28 U.S.C. § 2244(b), a federal court need not consider anew state prisoners' claims that were litigated and determined in a prior petition "unless the application alleges and is predicated on a factual or other ground not adjudicated on" the prior application "and unless the court ... is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ." [5] In *Kuhlmann v. Wilson*, 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986), a four-Justice plurality decided that the direction in *Sanders v. United States*, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963), to consider successive petitions when the "ends of justice" require would guide interpretation of § 2244(b) despite the fact that Congress omitted reference to the "ends of justice" in the 1966 amendment to § 2244. The Court went on to hold that "the 'ends of justice' require federal courts to entertain [successive] petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence." *Id.* 477 U.S. at 454, 106 S.Ct. at 2627; *see Williams v. Lynaugh*, 837 F.2d 1294, 1295 (5th Cir.1988) (per curiam) (using *Kuhlmann* test to dispose of successive claims), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 605 (1989); *Byrne v. Butler*, 847 F.2d 1135, 1138 (5th Cir. 1988) (per curiam) (same). Citing the law review article authored by Judge Henry Friendly which made the case for federal consideration of habeas petitions only when they raise a colorable showing of factual innocence, the Court indicated that to satisfy the test a petitioner must " 'show a fair probability that, in light of all the evidence, including ... evidence tenably claimed to have ... become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt.' " *Kuhlmann*, 477 U.S. at 455 n. 17, 106 S.Ct. at 2627 n. 17 (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970) (footnote omitted)).

■ May's third claim, the *Brady* claim with respect to the nondisclosure of the circumstances surrounding Miles's testimony, was not raised in the first petition, and so May is subject to the abuse of the writ doctrine.[6] *McCleskey v. Zant*, — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In *McCleskey*, the Court held that a claim not raised in a previous habeas petition is subject to dismissal unless the petitioner can show "cause" and "prejudice" for the default, or unless he can show that "a fundamental miscarriage of justice would result from a failure to entertain the claim." 111 S.Ct. at 1470. A petitioner succeeds in showing a fundamental miscarriage of justice, and thus can obtain federal review of a claim defaulted in the first round of habeas without showing cause and prejudice, when he satisfies the *Kuhlmann* "colorable showing of factual innocence" test. *Id.* at 1471. Thus, if a petitioner makes this showing, we have authority to consider the merits of both abusive claims that fail the cause and prejudice requirement, as well as claims that have been litigated and determined in a prior petition. *See Sawyer*, 945 F.2d at 816.

Although the State argues that May's claims should be dismissed as successive,[7] we can assume, *arguendo*, that May has made the requisite colorable showing of

5. Rule 9(b) of the Rules Governing § 2254 Cases similarly permits judges to refuse to consider successive claims, stating that "a second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits."

6. May unsuccessfully raised a *Brady* claim in the first federal petition, but it concerned the prosecution's alleged nondisclosure of certain physical evidence. *May v. Collins*, 904 F.2d at 230-31.

7. The State contends that the *Brady* claim also is successive, but, as explained in n. 6 *supra*, we consider the *Brady* claim he presents in this

factual innocence which triggers our ability to consider his all of his constitutional claims on the merits. The November 1991 affidavit of Miles, if credited, satisfies the *Kuhlmann/McCleskey* test, for if the account of the robbery Miles now provides is true, May was not the murderer of Jeanetta Murdaugh and was not even present in the Western Auto store at the time of that murder. We recognize that two words in the previous sentence—"if credited"—suggest another way of resolving the question whether May has made a colorable showing of factual innocence. The state court has already refused to credit Miles's affidavit, in effect determining that the information contained in it is not true. If we were to defer to the state court's factual finding at this stage of the inquiry, we would conclude that May is not entitled to have his claims considered on the merits because he has not passed the required threshold test for successive or abusive claims.[8] However, we need not and do not decide whether to defer to the state court's factual finding in the course of the actual innocence inquiry. Instead, we will simply assume *arguendo* that the evidence May has presented makes out a colorable showing of factual innocence because a reasonable trier of fact considering the evidence claimed to have become available after trial would entertain a reasonable doubt as to May's guilt.

## IV. ADEQUACY OF THE STATE COURT'S FACTFINDING PROCEDURE

That the district court could entertain on the merits the claims May raised in his

third petition does not necessarily mean that it was obligated to retry the factual findings the state court made in resolving the claims. As we noted above, the district court, following 28 U.S.C. § 2254(d), presumed the correctness of the state court's findings and denied May's request for an evidentiary hearing. The district court did so despite the fact that the state court relied solely on the written affidavits to resolve the underlying dispute over the truth of Miles and Howard's allegations. May contends in this appeal that two exceptions to the presumption of correctness apply and therefore entitle him to a live evidentiary hearing in federal court.

Section 2254(d) directs federal habeas courts to presume the correctness of a state court "determination after a hearing on the merits of a factual issue ... unless the applicant shall otherwise establish or it shall otherwise appear, or the respondent shall admit—

.   .   .   .   .

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing.... [9]

May relies primarily on the first of these two exceptions, contending that the "trial by affidavit" in the state court failed to give him a full and fair hearing.[10] Specifically, he argues that the State's rebuttal affidavits cannot establish the falsity of

---

petition not to have been raised before. That the *Brady* claim is abusive, rather than successive, does not affect our disposition of the claim.

**8.** With respect to the abusive claim, this of course assumes that he cannot satisfy the cause and prejudice standard and so must fall back on the actual innocence exception. In light of our ultimate resolution of this issue, we need not decide whether May has satisfied the cause and prejudice standard.

**9.** The habeas statute contains several additional prerequisites for the presumption of correctness to apply. The state court must be a court of competent jurisdiction; the writ applicant and

the state (or the state's officer or agent) must be parties to the proceeding; and the finding must be evidenced by a written finding, opinion, or other reliable and adequate written indicia. 28 U.S.C. § 2254(d). May has not claimed that these were not satisfied in the state court proceeding.

**10.** The § 2254(d)(2) and (d)(3) exceptions derive from *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *Townsend,* which predates the 1966 addition of the presumption of correctness to § 2254, held that a federal habeas court must hold an evidentiary hearing to resolve disputed facts if the petitioner did not receive a full and fair evidentiary hearing in state court either at the time of trial or in state

the Miles and Howard affidavits without "test[ing] through live testimony and cross-examination...." According to May, a factual dispute such as the one in this case, which is fundamentally based on an assessment of the credibility of witnesses, cannot be accurately resolved by relying on written submissions.

It is clear that § 2254(d) does not preclude a federal court from presuming the correctness of factfindings made from a paper record. In *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981), the Supreme Court held that the term "hearing" as used in § 2254(d) does not necessarily mean a trial-type hearing at which live testimony is taken and witnesses are cross-examined. In that case, the habeas petitioner had alleged for the first time on appeal that an unduly suggestive pretrial photographic identification had violated his due process right. The state appellate court, after reviewing the record, found as facts that the police had not exerted undue influence on the witnesses, that the witnesses had had an adequate opportunity to view the crime, and that their descriptions of the perpetrator had been accurate. After exhausting his state remedies without ever receiving a live hearing on the due process claim, he filed a petition for a writ of habeas corpus in federal court. The district court denied relief, but the Ninth Circuit, disputing the facts found by the state appellate court, reversed. The Supreme Court vacated the Ninth Circuit's opinion, however, because the court had failed to identify which of the § 2254(d) exceptions permitted it to disregard the presumption of correctness. 449 U.S. at 552, 101 S.Ct. at 771. Although it remanded for further consideration in light of § 2254(d), the Court held that the appellate level factfinding, based as it was solely on the written record before the appellate court, nevertheless qualified as a "hearing." The Court interpreted the term

"hearing" as used in § 2254(d) no more expansively than was suggested by the other language in that section. Thus, so long as "the habeas applicant and the State or its agent [are] parties to the state proceeding and ... the state-court determination [is] evidenced by 'a written finding, written opinion, or other reliable and adequate indicia.'" a hearing may be said to have taken place. *Id.* at 546–47, 101 S.Ct. at 768–69 (quoting 28 U.S.C. § 2254(d)). No additional procedural requirements are specified and none is absolutely necessary. *Id.; see also Camarillo v. Estelle*, 670 F.2d 473, 475 (5th Cir.1981) (*Sumner* requires for a "hearing on the merits of a factual issue" only that the petitioner and the state be parties to the proceeding and that written findings be made).

In the light of *Sumner*, we cannot agree with May's contention that a federal court *must* hold a hearing if the state court decided factual issues without the benefit of live testimony. Courts of appeals certainly had, prior to *Sumner*, found the lack of a live evidentiary hearing fatal to particular state court findings. *E.g., Bulger v. McClay*, 575 F.2d 407 (2d Cir.) (state trial judge's refusal to allow defense counsel in post-trial motion to cross-examine juror about alleged effect of news story on verdict rendered hearing unfair), *cert. denied*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978); *Campbell v. State of Minnesota*, 487 F.2d 1 (8th Cir.1973) (state appellate court's resolution of factual question by relying on affidavits is inadequate procedure); *Kerrigan v. Scafati*, 348 F.2d 187 (1st Cir.1965) (state trial court's choice between conflicting affidavits inadequate to provide a "full and fair fact hearing" under *Townsend*). But after *Sumner*, it is impossible to read these cases to stand for anything more than that the absence of a live hearing may *sometimes* be inadequate to afford a full and fair hearing. Indeed,

---

collateral proceedings. 372 U.S. at 312, 83 S.Ct. at 756. The Court went on to specify six circumstances under which a state hearing will not be considered full and fair. Among the six were that "the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing" and that "the material facts

were not adequately developed at the state-court hearing." *Id.* at 313, 83 S.Ct. at 757. Because § 2254(d) now contains these exceptions to the presumption of correctness accorded state court findings, *Townsend*'s recognition of these potential shortcomings in state court factfindings does not advance May's argument.

because these decisions proceed under the pre-*Sumner* assumption that the absence of a live hearing in state court automatically triggers a federal evidentiary hearing, we think they no longer stand as persuasive authority.

*Sumner* also mitigates, at least in the context of federal deference to state court findings, the force of *Walker v. Johnston,* 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941), and *Machibroda v. United States,* 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962). *Walker* was a habeas corpus proceeding brought by a federal prisoner under an earlier version of the federal habeas statute. At the time, the statute provided that if the parties' initial submissions raised a question of fact, the prisoner must be brought to court for a hearing on his allegations. The Court in *Walker* held that the statute required district courts to resolve factual disputes at a live evidentiary hearing rather than on the pleadings and affidavits. 312 U.S. at 285, 61 S.Ct. at 578. In *Machibroda,* the Court interpreted the revised federal habeas corpus statute, 28 U.S.C. § 2255, also to require an evidentiary hearing when the affidavits submitted by the petitioner and the Government raise fact disputes. 368 U.S. at 494, 82 S.Ct. at 513–14.[11] Both cases, however, deal only with the hearing requirement applicable to petitions for habeas corpus brought by *federal* prisoners. The critical difference between § 2255 (and its predecessor) and § 2254 is that the latter provides prisoners in state custody with a layer of review only after state courts have had an opportunity to fully consider the claims. *See* 28 U.S.C. § 2254(b) (requiring writ applicant to exhaust state remedies); *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (federal court may not consider

mixed petition containing exhausted and unexhausted claims). Congress in enacting the presumption of correctness in 1966 intended to minimize the inevitable friction that results from a statute under which federal judges may overturn factual and legal conclusions made by state courts in direct criminal or collateral proceedings. *See Sumner,* 449 U.S. at 550, 101 S.Ct. at 770. The result of this presumption is a statutory scheme which allocates to state courts in the first instance the responsibility for determining the facts underlying a petitioner's claims. As we pointed out above, the Court in *Sumner* refused to read § 2254(d) as mandating the state courts' use of any particular procedures for finding facts. Given the concerns the *Sumner* Court expressed about the intrusion on state interests caused by § 2254,[12] it is not difficult to understand why Court refused to eliminate state findings based on a written record from the scope of the presumption of correctness. The decisions in *Walker* and *Machibroda* reflect an assessment of the need for live hearings in a context which does not implicate the state courts' statutory role as the initial decisionmaker, and therefore do not control the outcome here.

*Sumner,* however, hardly disposes of the issue before us, for the case tells us only that the presumption of correctness does not become inapplicable for the *sole* reason that no live evidentiary hearing has been held. The Court did nothing to call into question the validity of the § 2254(d)(2) exception for factfinding procedures which are not adequate to afford "full and fair" hearings. It remains possible that under certain circumstances, findings made on a paper record will satisfy the (d)(2) excep-

---

11. The statute provided, in relevant part:
   Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto.
   28 U.S.C. § 2255.

12. *See Sumner,* 449 U.S. at 549–50, 101 S.Ct. at 770–71. Federalism concerns have been a cen-

tral theme of the Court's habeas decisions in the years since *Sumner. See, e.g., McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 1468–69, 113 L.Ed.2d 517 (1991); *Coleman v. Thompson,* —— U.S. ——, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991); *Kuhlmann v. Wilson,* 477 U.S. 436, 452–53, 106 S.Ct. 2616, 2626–27, 91 L.Ed.2d 364 (1986); *Murray v. Carrier,* 477 U.S. 478, 487, 106 S.Ct. 2639, 2644–45, 91 L.Ed.2d 397 (1986); *Rose*

tion. The Court recognized this in dicta in ·*Cabana v. Bullock*, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), *overruled in part on other grounds, Pope v. Illinois*, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), a case which was concerned with the question whether the factual findings required under *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), must be made by the jury at the guilt-innocence or sentencing phase of a trial.[13] After pointing out that *Sumner* extends the presumption of correctness to facts found by appellate as well as trial courts, the Court noted that "[t]here might be instances, however, in which the presumption would not apply to appellate factfinding regarding the *Enmund* criteria because appellate factfinding procedures were not 'adequate,' see 28 U.S.C. § 2254(d)(2)." *Cabana*, 474 U.S. at 388 n. 5, 106 S.Ct. at 698 n. 5. The Court recognized a central concern when facts are found on a written record, but ultimately declined to hold that the *Enmund* determination could not be made in this fashion:

> For example, the [factual inquiry required under *Enmund*] might in a given case turn on credibility determinations that could not be accurately made by an appellate court on the basis of a paper record .... The possibility that such cases falling within the § 2254(d)(2) exception may exist, however, does not excuse the habeas court of its obligation to examine the entire state process to determine whether the *Enmund* findings have been made, for it is by no means apparent that appellate factfinding will always be inadequate. For example, in some cases it may be possible to determine the *Enmund* issue adversely to the defendant even if credibility issues and other ambiguities in the record are resolved in his or her favor.

*v. Lundy*, 455 U.S. 509, 518–19, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982).

**13.** *Enmund* held that the Eighth Amendment prohibits the execution of "one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. Accordingly, an appropriate finding must be made prior to imposition of the death penalty upon

474 U.S. at 388 n. 5, 106 S.Ct. at 698 n. 5 (citations omitted). This footnote "guide[d] our inquiry into when factfinding procedures will not be adequate to merit the presumption of correctness" in *Buxton*, 879 F.2d at 146, but by no means did we consider it to preclude application of the presumption to state court factfindings made without a live evidentiary hearing.

Our precedents and the precedents of other circuits in the decade since *Sumner* have generally recognized that it is necessary to examine in each case whether a paper hearing is appropriate to the resolution of the factual disputes underlying the petitioner's claim. Federal courts have held that the presumption of correctness should be applied to findings made at the appellate stage, even where the findings depend on credibility choices, in cases presenting a variety of substantive claims. *See, e.g., Williams v. Lynaugh*, 809 F.2d 1063, 1066 (5th Cir.) (state appellate court's finding that juror was properly excused for cause under *Witherspoon* was entitled to a presumption of correctness), *cert. denied*, 481 U.S. 1008, 107 S.Ct. 1635, 95 L.Ed.2d 207 (1987); *Anderson v. Thieret*, 903 F.2d 526, 530 (7th Cir.1990) (state appellate court's findings on issues subsidiary to finding of voluntariness of confession were entitled to deference); *Tinsley v. Borg*, 895 F.2d 520, 526 (9th Cir.1990) (deferring to state appellate court's findings on issue of juror misconduct), *cert. denied*, —— U.S. ——, 111 S.Ct. 974, 112 L.Ed.2d 1059 (1991); *Spillers v. Lockhart*, 802 F.2d 1007, 1010 (8th Cir.1986) (deferring to state appellate court's finding that counsel's failure to make a trial objection was a tactical decision). The Seventh Circuit has deferred to appellate factfindings in a case very much like this one, in which the peti-

one convicted under the typical state felony murder statute. *Cabana* held that, because the states are free to determine at what point in the process the required *Enmund* finding will be made, federal habeas courts reviewing a claim that capital punishment was imposed on one who is death-ineligible under *Enmund* must examine the entire record of the state court proceedings to determine whether the *Enmund* finding was made. 474 U.S. at 386–87, 106 S.Ct. at 696–97.

tioner contended that prosecutors knowingly used perjured testimony. *United States ex rel. Jones v. DeRobertis*, 766 F.2d 270, 272–73 (7th Cir.1985), *cert. denied*, 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986). Only in specific reliance on the dicta in *Cabana* has a federal court of appeals concluded that appellate factfinding on the elements of *Enmund* is inadequate to afford the petitioner a full and fair hearing. *Hyman v. Aiken*, 824 F.2d 1405, 1411 (4th Cir.1987).[14]

We have dealt on several occasions with factfinding by affidavit at the state trial court level, and each time we have found the procedures adequate for the purposes of § 2254(d)(2)—even where the factual conclusions depended on credibility determinations. In *Smith v. Estelle*, 711 F.2d 677 (5th Cir.1983), *cert. denied*, 466 U.S. 906, 104 S.Ct. 1685, 80 L.Ed.2d 159 (1984), the petitioner submitted an affidavit in state collateral proceedings alleging that his attorney was ineffective, and the attorney submitted an affidavit setting forth the actions he had taken in representing the petitioner. The state court, relying only on the affidavits, made written findings of fact, "clearly making credibility determinations in favor of [the attorney] and adverse to [the petitioner]." *Id.* at 681. We deferred to the state court's finding that the representation had been effective and also concluded that the finding was fairly supported by the record. *Id.* at 681–82.[15] In

*Evans v. McCotter*, 805 F.2d 1210 (5th Cir. 1986), we held in the alternative that a state court's use of affidavits to resolve a factual dispute over whether the petitioner was insane was an adequate procedure. *Id.* at 1214.[16] The next decision in this line, *Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir. 1987), also involved competing affidavits on the question of effective assistance of counsel, and, citing *Smith* and *Sumner*, we held that the "state court's hearing by affidavit was sufficient to invoke the presumption [of correctness]." *Id.* at 1101.

We come at last to our decision in *Buxton*, the case upon which the district court relied in holding that the state court procedures were adequate. In *Buxton*, the petitioner in state collateral proceedings filed the affidavit of one of his trial attorneys in support of his contention that he received ineffective assistance of counsel. The attorney's affidavit told of alleged juror misconduct and the efforts that were made to substantiate such a claim. In its response to the petition, the State submitted the affidavit of the petitioner's other trial attorney. This affidavit told a somewhat different story. The state trial court entered findings of fact in which it credited the second attorney's affidavit and "implicitly rejected those portions of [the first attorney's affidavit] which are inconsistent with [the second attorney's] affidavit." *Id.* at 142 (footnote omitted). The court "clearly made a credibility choice between the [two

---

**14.** The decision of the state appellate court in *Hyman* failed to address whether the petitioner killed, attempted to kill, or intended to kill. *Hyman*, 824 F.2d at 1411.

Another case in which a court of appeals has refused to presume the correctness of facts found at the state appellate level, *Smith v. McCormick*, 914 F.2d 1153 (9th Cir.1990), appears to us to rely on faulty reasoning. The court in *McCormick* relied on two cases predating *Sumner* to conclude that a paper hearing was an inadequate procedure. One of the cases, *Woodcock v. McCauley*, 563 F.2d 806 (7th Cir. 1977), specifically held that the presumption of correctness applied only to facts found after a state evidentiary hearing, and the other, *Jackson v. Estelle*, 570 F.2d 546 (5th Cir.1978), held that the presumption would not apply to facts found in reliance on *ex parte*, unsworn declarations of an allegedly ineffective attorney. *Sumner* clearly negates the effect of *Woodcock*, and *Jackson*

appears to involve a problem quite different than the one presented in *McCormick*.

**15.** We disagree with May's characterization of *Smith* as a case in which there really was no factual dispute raised by the affidavits. Although we stated that "for the most part, [the attorney's] averments were uncontradicted in their particulars by [the petitioner's] affidavit, which tended to make broad and general allegations," the next paragraph indicates that there was a significant factual dispute over the question whether the attorney coerced the petitioner into pleading guilty. 711 F.2d at 682.

**16.** Although we recognize that we first held in *Evans* that the petitioner's affidavit was too conclusory to raise a fact question as to his sanity, we also rested our decision on the alternative ground described in the text. 805 F.2d at 1214.

affidavits], at least to the extent that those two affidavits were contradictory." *Id.* at 144. As in the earlier cases, we concluded that the factfinding procedure was adequate to afford the petitioner a full and fair hearing.

Our conclusion in *Buxton* depended on the fact that the state trial judge who reviewed the affidavits on state habeas was the same judge who presided over the petitioner's trial and sentencing. We pointed out that the case was different from the hypothetical posited in the *Cabana* footnote, and indeed was different from all appellate factfindings, because the trial judge was in an optimal position to assess the credibility of the affidavits. *Id.* at 146. He had observed the attorneys in action during the trial, was familiar with the jury and the layout of the courthouse, and could determine whether a comment made by a juror was likely to have been overheard. In addition, we noted that the judge may have developed a respect for the first attorney (the one the petitioner claimed rendered ineffective assistance) which would cause the judge to wonder why she failed to take the proper actions in response to juror misconduct. *Id.*[17]

■ These considerations guide our decision today. As in *Buxton*, the state judge here was faced with the task of choosing between competing versions of the actual events at trial. But the judge did not have to make this decision on the cold record alone; rather, he could compare the information presented in the various affidavits against his own firsthand knowledge of the trial. The judge observed the testimony of Miles and Howard, had a chance to study their demeanor on both direct and cross-examination, and undoubtedly formed a view as to their veracity. Against this background, it was not necessary that he take live testimony from Miles and Howard to determine whether the accounts of the

trial they offered in their recent affidavits were worthy of belief.

That the factual dispute in this case concerns allegedly false trial testimony bolsters our conclusion that the trial judge could make the requisite findings without a live hearing. "[R]ecanting affidavits and witnesses are viewed with extreme suspicion by the courts." *United States v. Adi,* 759 F.2d 404, 408 (5th Cir.1985); *see also DeRobertis,* 766 F.2d at 272 ("Courts treat recantations and claims of perjury with great skepticism even under the best of circumstances"); *United States v. Krasny,* 607 F.2d 840 (9th Cir.1979), *cert. denied,* 445 U.S. 942, 100 S.Ct. 1337, 63 L.Ed.2d 775 (1980). In this circuit, a federal trial judge, faced with a motion for a new trial predicated upon the contention that a witness has provided a recanting affidavit, must compare the trial record with the affidavit of recantation and determine for himself whether the affidavit is worthy of belief. *Newman v. United States,* 238 F.2d 861, 863 (5th Cir.1956); *see Adi,* 759 F.2d at 408–09 (reaffirming test of *Newman*).[18] The decision not to grant a new trial is reviewable only for abuse of discretion. *Id.* at 407. The same holds true in Texas: "Even where a recantation of testimony is made by the principal witness, a trial court is entitled to disbelieve that later statement and accept the earlier testimony as true," *Banda v. State,* 727 S.W.2d 679, 682 (Tex. App.—Austin 1987, no writ) (citing *Williams v. State,* 375 S.W.2d 449, 452 (Tex.Cr.App.1964)), and denial of a new trial based on affidavits of recantation will be upheld unless there is an abuse of discretion. *Id.; see also Dillard v. State,* 550 S.W.2d 45, 52 (Tex.Crim.App.1977); *Wilson v. State,* 445 S.W.2d 213 (Tex.Crim.App. 1969). The level of insulation the law grants to a skeptical trial judge's assessment of recanting affidavits reflects the notion that trial judges are in the best position to compare a witness's earlier tes-

---

**17.** We recently reaffirmed *Buxton, Uresti* and *Smith* in *Carter v. Collins,* 918 F.2d 1198, 1202 (5th Cir.1990), holding that the state court's resolution of an ineffective assistance claim by reference to affidavits was entitled to the presumption of correctness.

**18.** In *Adi,* we upheld a trial judge's decision not to grant a new trial despite the fact that the recanting witness did not appear at the hearing on the motion. 759 F.2d at 409.

timony with his new version of the facts. Thus, the concerns about the inadequacy of a "trial by affidavit" are even more diminished in the context of a factual dispute rooted in witnesses' claims that they perjured themselves at trial.[19] The state trial judge in this case could determine Miles and Howard's credibility by comparing their affidavits with their trial testimony, and his findings of fact are therefore entitled to a presumption of correctness in this federal habeas proceeding.

## V. THE DISTRICT COURT'S LEGAL CONCLUSIONS

■ Section 2254(d) accords a presumption of correctness only to state court factual findings. It is the duty of the district court, and ours as well, to review de novo the legal conclusions reached on the basis of the facts. *Buxton*, 879 F.2d at 147. To succeed in showing a due process violation from the use of perjured testimony, May had the burden of establishing that (1) Miles and Howard gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false. *Giglio*, 405 U.S. at 153–54, 92 S.Ct. at 765–66; *Smith v. Black*, 904 F.2d 950, 961 (5th Cir.1990), *petition for cert. filed* 59 U.S.L.W. 3526 (U.S. Jan. 22, 1991) (No. 90–1164). We have emphasized that due process is not violated "unless the prosecution actually knows or believes the testimony to be false or perjured...." *United States v. Brown*, 634 F.2d 819, 827 (5th Cir.1981), *see also United States v. Sutherland*, 656 F.2d 1181, 1203 (5th Cir.1981), *cert. denied*, 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982). To succeed in showing a due process viola-

tion from the prosecution's failure to disclose material exculpatory evidence, May had the burden of establishing that (1) evidence was suppressed by the prosecution; (2) the evidence was favorable to the defense; and (3) the evidence was material either to guilt or punishment. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196; *Brogdon v. Blackburn*, 790 F.2d 1164, 1167 (5th Cir. 1986), *cert. denied*, 481 U.S. 1042, 107 S.Ct. 1985, 95 L.Ed.2d 824 (1987).

■ The state court's findings undermine the essential basis of these two claims, as well as the claim that the prosecutors violated May's Sixth Amendment rights by interfering with the cross-examination of Miles.[20] If Miles and Howard's testimony at trial was true and the statements in their affidavits false, May has failed in his burden under *Giglio* to show that perjured testimony was used. Similarly, if Miles and Howard were not lying at trial May has failed in his burden under *Brady* to show that the prosecution did not disclose that they were lying. Finally, if Miles was not coerced into changing his cross-examination testimony, May has shown no Sixth Amendment or due process violation. Given the state court's factual findings, May cannot establish that any of his constitutional rights were violated. Moreover, we agree with the district court's conclusion that the state court findings were amply supported by the record.

## VI. CONCLUSION

The issues May raises warrant the granting of a certificate of probable cause to appeal. We conclude, however, that the hearing May received in state court was

---

**19.** Our conclusion that May received an adequate hearing in state court also disposes of his argument on the application of the § 2254(d)(3) exception. The hearing procedure was sufficient to enable the development of the material facts even without the opportunity for live testimony or cross-examination, because May was not prevented in any way from placing all relevant information before the factfinder. *See Guice v. Fortenberry*, 661 F.2d 496, 500 (5th Cir.1981) (en banc).

**20.** May cited *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), as providing the basis for a Sixth Amendment violation, but that case held that the state may not admit into evidence against an accused a nontestifying co-defendant's confession. *Id.* at 546, 106 S.Ct. at 2064. May's allegation may be more properly characterized as raising a variation on a *Giglio* due process claim, as he is arguing that the prosecutors coerced Miles into changing his cross-examination statements. Certainly, there is no question that May had an opportunity to confront Miles at trial.

full and fair notwithstanding that court's decision not to hold an evidentiary hearing to resolve disputed issues of fact. The district court therefore properly presumed the correctness of the state court's findings. Given these findings, May has not established the violation of any of his constitutional rights. The order of the district court denying habeas relief is therefore AFFIRMED, and the stay of execution entered by this court on November 26, 1991 is VACATED.